George Shepard, and all other inmates in
a similar situation, appellees, v. Robert P.
Houston, director, Nebraska Department
of Correctional Services, in his official
and individual capacities, appellant.

___ N.W.2d ___

Filed November 7, 2014.    No. S-13-1032.

1. **Constitutional Law.** Constitutional interpretation presents a question of law.
2. **Courts: Justiciable Issues.** Ripeness is a justiciability doctrine that courts consider in determining whether they may properly decide a controversy.
3. **Courts.** The fundamental principle of ripeness is that courts should avoid entangling themselves, through premature adjudication, in abstract disagreements based on contingent future events that may not occur at all or may not occur as anticipated.
4. **Courts: Jurisdiction.** A determination of ripeness depends upon the circumstances in a given case and is a question of degree.
5. **Courts: Jurisdiction: Appeal and Error.** With regard to the jurisdictional aspect of ripeness, an appellate court employs a two-part test in which it considers (1) the fitness of the issues for judicial decision and (2) the hardship of the parties of withholding court consideration.
6. **Actions.** Generally, a case is ripe when no further factual development is necessary to clarify a concrete legal dispute susceptible to specific judicial relief, as distinguished from an advisory opinion regarding contingent future events.
7. **Constitutional Law: Criminal Law.** The Ex Post Facto Clauses forbid the application of any new punitive measure to a crime already consummated.
8. **Constitutional Law: Statutes: Legislature.** The Ex Post Facto Clauses ensure that individuals have fair warning of applicable laws, and they guard against vindictive legislative action.
9. **Constitutional Law: Criminal Law: Statutes.** To fall within the ex post facto prohibition, a law must be retrospective or retroactive—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it either by altering the definition of criminal conduct or by increasing the punishment for the crime.
10. ____: ____: ____. Any statute that punishes as a crime an act previously committed which was innocent when done, which makes more burdensome the punishment for a crime after its commission, or which deprives one charged with a crime of any defense available according to law at the time when the act was committed is prohibited as ex post facto.
11. **Constitutional Law.** Subtle ex post facto violations are no more permissible than overt ones.
12. **Criminal Law: DNA Testing.** When a law requiring a DNA sample punishes refusal to provide a sample as an offense separate from the offense that made the person subject to DNA sampling, such law does not violate ex post facto prohibitions.

13. **DNA Testing: Statutes: Sentences.** Regardless of whether the requirement of a DNA sample is itself considered civil, Neb. Rev. Stat. § 29-4106(2) (Cum. Supp. 2012) is punitive in mandating forfeiture of all good time and thereby increasing the period of a defendant's incarceration.

Appeal from the District Court for Lancaster County: Andrew R. Jacobsen, Judge. Affirmed.

Jon Bruning, Attorney General, and Jessica M. Forch for appellant.

George Shepard, pro se.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

McCormack, J.

## I. NATURE OF CASE

Neb. Rev. Stat. § 29-4106(2) (Cum. Supp. 2012) provides for retroactive application of its requirement that all inmates convicted of a felony sex offense or other specified offense submit a DNA sample before being discharged from confinement. Section 29-4106(2) also specifically provides that those inmates convicted before the passage of § 29-4106 "shall not be released prior to the expiration of his or her maximum term of confinement or revocation or discharge from his or her probation unless and until a DNA sample has been collected." In effect, § 29-4106(2) provides that an inmate will forfeit his or her past and future good time credit if the inmate refuses to submit a DNA sample. The issue is whether § 29-4106(2), as applied to an inmate who was convicted before its passage, violated the Ex Post Facto Clauses of U.S. Const. art. I, § 10, and Neb. Const. art. I, § 16.

## II. BACKGROUND

George Shepard was sentenced on July 11, 1990, to a combined term of up to 50 years' imprisonment. He was sentenced to 40 years' imprisonment for sexual assault in the first degree

and 10 years' imprisonment for manufacturing child pornography, the sentences to run consecutively.[1]

Under the good time law in effect at the time of Shepard's crimes, Shepard's projected mandatory discharge date was May 4, 2015. Neb. Rev. Stat. § 83-1,107 (Reissue 1987) provided:

(1) The chief executive officer of a facility shall reduce for good behavior the term of a committed offender as follows: Two months on the first year, two months on the second year, three months on the third year, four months for each succeeding year of his term and pro rata for any part thereof which is less than a year. The total of all such reductions shall be credited from the date of sentence, which shall include any term of confinement prior to sentence and commitment as provided pursuant to section 83-1,106, and shall be deducted:

(a) From his minimum term, to determine the date of his eligibility for release on parole; and

(b) From his maximum term, to determine the date when his discharge from the custody of the state becomes mandatory.

(2) While the offender is in the custody of the Department of Correctional Services, reductions of such terms may be forfeited, withheld and restored by the chief executive officer of the facility, with the approval of the director after the offender has been consulted regarding the charges of misconduct.

(3) While the offender is in the custody of the Board of Parole, reductions of such terms may be forfeited, withheld, and restored by the Parole Administrator with the approval of the director after the offender has been consulted regarding the charges of misconduct or breach of the conditions of his parole. In addition, the Board of Parole may recommend such forfeitures of good time to the director.

---

[1] See *State v. Shepard*, 239 Neb. 639, 477 N.W.2d 567 (1991).

(4) Good time or other reductions of sentence granted under the provisions of any law prior to August 24, 1975, may be forfeited, withheld, or restored in accordance with the terms of the act.

Neb. Rev. Stat. § 83-1,107.01 (Reissue 1987) further provided:

(1) In addition to the reductions provided in section 83-1,107, an offender shall receive, for faithful performance of his assigned duties, a further reduction of five days for each month of his term. The total of all such reductions shall be deducted from his maximum term to determine the date when his discharge from the custody of the state becomes mandatory.

(2) While the offender is in the custody of the Department of Correctional Services, reductions of such terms may be forfeited, withheld, and restored by the chief executive officer of the facility, with the approval of the director after the offender has been consulted regarding any charges of misconduct.

(3) While the offender is in the custody of the Board of Parole, reductions of such terms may be forfeited, withheld, and restored by the Parole Administrator with the approval of the director after the offender has been consulted regarding the charges of misconduct or breach of the conditions of his parole. In addition, the Board of Parole may recommend such forfeitures of good time to the director.

Disciplinary procedures for the Nebraska Department of Correctional Services (Department) are governed by Neb. Rev. Stat. §§ 83-4,109 to 83-4,123 (Reissue 2008). Under § 83-4,111(3), which continues to be in essentially the same form as it was at the time of Shepard's crimes, the Department has broad powers to adopt and promulgate rules and regulations, including criteria concerning good time credit, but such rules and regulations "shall in no manner deprive an inmate of any rights and privileges to which he or she is entitled under other provisions of law." Under § 83-4,114.01(2), previously located at Neb. Rev. Stat. § 83-185(2) (Reissue 1987), good time may be forfeited only in cases involving "flagrant or

serious misconduct." Further, pursuant to § 83-4,122, in disciplinary cases involving the loss of good time, forfeiture must be done through disciplinary procedures adopted by the director of the Department that are consistent with various requirements of the statute.

Various factors could be considered before making a determination regarding a committed offender's actual release on parole upon the date of eligibility.[2] As for the mandatory discharge date, however, the Board of Parole was required to discharge a parolee from parole and the Department was required to discharge a legal offender from the custody of the Department "when the time served . . . equals the maximum term less all good time reductions."[3]

In 1997, the Legislature passed provisions under the DNA Detection of Sexual and Violent Offenders Act, now known as the DNA Identification Information Act (the Act),[4] for collecting DNA samples from any person convicted of a felony sex offense or other specified offense, in order to place such sample for use in the State DNA Sample Bank. Since 1997, § 29-4106(2) has provided for the retroactive application of the Act to persons convicted before the effective date of the Act but still serving a term of confinement on the effective date of the Act.

Under § 29-4106(2), such person shall not be released prior to the expiration of his or her maximum term of confinement unless and until a DNA sample has been drawn. Section 29-4106(2) currently states:

> A person who has been convicted of a felony offense or other specified offense before July 15, 2010, who does not have a DNA sample available for use in the State DNA Sample Bank, and who is still serving a term of confinement or probation for such felony offense or other specified offense on July 15, 2010, *shall not be released prior to the expiration of his or her maximum*

---

[2] See Neb. Rev. Stat. § 83-1,115 (Reissue 1999).

[3] Neb. Rev. Stat. § 83-1,118(3) and (4) (Reissue 1987).

[4] See Neb. Rev. Stat. §§ 29-4101 to 29-4115.01 (Reissue 2008 & Cum. Supp. 2012).

> *term of confinement or revocation or discharge from*
> *his or her probation unless and until a DNA sample has*
> *been collected.*

(Emphasis supplied.)

Department administrative regulation (A.R.) 116.04 implements this statute and provides that an inmate's refusal to provide a DNA sample will result in administrative withholding of all good time and that the inmate's sentence will be recalculated to the maximum prison term. Department employees testified that under A.R. 116.04, the Department gives inmates until 7 days prior to their release date, as calculated with good time credit, to submit their DNA sample. If an inmate does not submit a sample by that time, the inmate is given notice of a classification hearing. The deputy director over institutions for the Department explained that under A.R. 116.04, good time credit is taken away through a reclassification process rather than through a disciplinary procedure. The reclassification results in forfeiture of the good time. The deputy director explained, "That's what our policy allows for and that's carrying out what we believe state law says." The deputy director was aware of no other behaviors for which good time credits would be forfeited through a reclassification process.

The crimes for which Shepard was sentenced in 1990 are subject to DNA testing under § 29-4106. Section 29-4106 was not in effect when the crimes were committed. On August 18, 2010, Shepard was asked by the Department staff to provide a DNA sample. He declined to do so, and he has not given a DNA sample since that time. The deputy director testified that if Shepard continued to refuse to submit to DNA testing, his good time credit would be forfeited through reclassification under A.R. 116.04. Although in 2011, Shepard apparently would have been parole eligible based on good time, the record does not clearly reflect the reason why Shepard has not been released on parole.

After dismissing a prior complaint as not yet ripe for review, on April 7, 2011, the district court granted Shepard leave to file an amended complaint challenging the impending forfeiture

of his good time credit. After sustaining various motions to dismiss and for summary judgment, the only remaining claim of Shepard's amended complaint was for declaratory judgment challenging the application of § 29-4106 as violative of the prohibition against ex post facto laws. The only remaining defendant was Robert P. Houston in his official capacity as director of the Department.

The court noted that Shepard had failed to make the agency promulgating the challenged rule a party to the action, as required by the Uniform Declaratory Judgments Act, but the court found that the action challenging the validity of § 29-4106 was not so barred. The court further found Shepard's declaratory judgment claim was ripe for review. The court reasoned that although § 29-4106(2) and A.R. 116.04 would not potentially be applied to Shepard until his May 4, 2015, release date, declaratory judgment is appropriate under the circumstances to prevent future harm. The court did not address Shepard's parole eligibility.

The district court declared § 29-4106(2) unconstitutional under the Ex Post Facto Clauses of U.S. Const. art. I, § 10, and Neb. Const. art. I, § 16, as applied to Shepard, an inmate sentenced prior to the statute's enactment. Houston was accordingly enjoined from withholding from Shepard any good time under the provisions of § 29-4106(2).

The court reasoned that the effect of § 29-4106(2) was to retroactively repeal the good time statutes as to Shepard if he did not provide a DNA sample. The court noted that Shepard had not been found guilty of any misconduct while incarcerated. The court stated that while merely requiring a DNA sample would not impose any additional penalty on an inmate, the language of the statute eliminating good time credit does impose an additional penalty not present at the time of Shepard's convictions.

The court rejected the argument that the forfeiture of good time for refusing to submit to DNA testing is a result of a violation of valid administrative prison regulations rather than the imposition of the penalty imposed by statute. The court said that A.R. 116.04 is facially a mere enforcement of the statute

and that Neb. Rev. Stat. § 83-173(6) (Reissue 2008) does not grant the Department director authority to impose penalties for failure to comply with a statutory requirement. And, under § 83-4,111, discipline may be imposed only for conduct outlined in the "Code of Offenses" adopted by the Department and appearing in title 68, chapter 5, of the Nebraska Administrative Code. Failure to submit a DNA sample, the court noted, is not listed as an offense within the code of offenses. While "[d]isobeying an [o]rder" and "[v]iolation of [r]egulations" are listed as offenses, loss of good time may be imposed only for such violations if they are "serious or flagrant," and no more than 1 month of good time can be lost for such serious and flagrant violations.[5]

Houston appeals. Shepard does not cross-appeal.

## III. ASSIGNMENTS OF ERROR

Houston assigns that the district court erred in (1) determining Shepard's action was ripe for review and (2) determining that § 29-4106(2) violates the constitutional prohibition against ex post facto laws, "as this statute is a Constitutional civil regulatory scheme which does not impose punishment."

## IV. STANDARD OF REVIEW

[1] Constitutional interpretation presents a question of law.[6]

## V. ANALYSIS

The only issues presented by the parties in this appeal are whether the district court erred in determining that Shepard's claim was ripe for review and whether it erred in concluding that the retroactive application of § 29-4106(2) was unconstitutional.

## 1. Ripeness

We first address the question of ripeness. According to Houston, Shepard's claim is not ripe, because "[t]here is merely a possible threat of harm, sometime in the future, and we

---

[5] See 68 Neb. Admin. Code, ch. 5, § 005, and ch. 6, § 011 (2008).

[6] *Krings v. Garfield Cty. Bd. of Equal.*, 286 Neb. 352, 835 N.W.2d 750 (2013).

have no idea whether that harm will even come to fruition."[7]
We disagree.

[2,3] Ripeness is a justiciability doctrine that courts consider in determining whether they may properly decide a controversy.[8] The fundamental principle of ripeness is that courts should avoid entangling themselves, through premature adjudication, in abstract disagreements based on contingent future events that may not occur at all or may not occur as anticipated.[9]

[4-6] A determination of ripeness depends upon the circumstances in a given case and is a question of degree.[10] With regard to the jurisdictional aspect of ripeness, we employ a two-part test in which we consider (1) the fitness of the issues for judicial decision and (2) the hardship of the parties of withholding court consideration. Because ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the district court's decision that must govern.[11] Generally, a case is ripe when no further factual development is necessary to clarify a concrete legal dispute susceptible to specific judicial relief, as distinguished from an advisory opinion regarding contingent future events.[12]

First, this appeal presents a constitutional question that is essentially legal in nature and may be resolved without further factual development.[13]

Second, this appeal presents a concrete controversy and does not present merely abstract disagreements based on contingent future events that may not occur at all or may not

---

[7] Brief for appellant at 11.

[8] *Pennfield Oil Co. v. Winstrom*, 276 Neb. 123, 752 N.W.2d 588 (2008).

[9] *Id.*

[10] See *Harleysville Ins. Group v. Omaha Gas Appliance Co.*, 278 Neb. 547, 772 N.W.2d 88 (2009).

[11] *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S. Ct. 335, 42 L. Ed. 2d 320 (1974).

[12] *Pennfield Oil Co. v. Winstrom, supra* note 8.

[13] See *City of Omaha v. City of Elkhorn*, 276 Neb. 70, 752 N.W.2d 137 (2008).

occur as anticipated. Shepard has already declined to submit a DNA sample and professes that he will continue to do so. The deputy director of the Department testified that Shepard's good time will be forfeited if he continues to refuse to submit a DNA sample. The deputy director, indeed, has no discretion under § 29-4106(2) to do otherwise. While it is possible that Shepard will change his mind, thereby making the controversy moot, that possibility is more speculative than the present reality. The hypothetical possibility of future mootness does not render the present appeal unripe.

Finally, addressing the underlying merits in the present appeal will avoid significant hardship. The Department does not conduct the reclassification proceedings that result in good time forfeiture until 7 days before the mandatory release date. If we decline to address the merits in this appeal and demand that the process of reclassification be complete before we consider the matter ripe, then it will not be possible for Shepard's action to be determined before Shepard would be subjected to potentially illegal incarceration. Deciding the case now avoids the possibility of the irreparable harm to Shepard of being imprisoned past the mandatory discharge date (without forfeiture) of May 4, 2015. In addition, by deciding the case now, we avoid the needless waste of judicial resources through future relitigation of the issues.[14]

Having found the matter ripe for review, we turn to the underlying merits of Shepard's ex post facto claim.

## 2. Ex Post Facto

Under the laws in effect at the time Shepard committed his crimes, he was entitled to mandatory "regular" good time, automatically earned under the formula stated above, as well as "meritorious" good time, if earned though good conduct.[15] His parole eligibility date was calculated by deducting good time from his minimum sentence, and his mandatory discharge date was calculated by deducting good time from his

---

[14] See *id.*

[15] See *Johnson v. Bartee*, 228 Neb. 111, 421 N.W.2d 439 (1988).

maximum sentence.[16] This appeal, however, concerns only Shepard's mandatory discharge date.

Good time earned could be forfeited under the scheme in effect at the time of Shepard's crimes, but only pursuant to specified procedures and regulations and only, under § 83-4,114.01(2), for "flagrant or serious misconduct." There were no statutory provisions allowing for the forfeiture of future mandatory good time or for general ineligibility for participation in the good time scheme as a result of misconduct. There were no provisions mandating that inmates provide a DNA sample.

By changing the release date to the maximum term of confinement or revocation or discharge from probation, § 29-4106(2) effectively provides for mandatory forfeiture of participation in the good time credit system upon the act of refusing to submit a DNA sample under the requirements first passed in 1997. The State does not claim that the refusal to provide a DNA sample is an act of "flagrant or serious misconduct," and it is clear from the record that when a convicted person refuses to provide a DNA sample, the Department does not change the mandatory discharge date pursuant to procedures provided for disciplinary forfeiture of good time.

Facially, § 29-4106(2) applies retroactively to any person who has been convicted of a felony offense or other specified offense before July 15, 2010. It thus facially encompasses both inmates whose crimes occurred before the passage of the Act in 1997 and those whose crimes occurred after the passage of the Act. As applied to Shepard, however, § 29-4106(2) is retroactive. Section 29-4106(2) plainly expanded the scope of potential forfeiture of good time beyond the limitations to flagrant or serious misconduct in existence at the time of his crimes. Further, by mandating that the inmate shall not be released prior to the expiration of his or her maximum term of confinement or revocation or discharge from his or her probation, § 29-4106(2) increased the amount of good time that could be lost for any singular act.

---

[16] See § 83-1,107.

Nevertheless, the State argues that providing a DNA sample is not in itself punitive. And to the extent that Shepard is punished for refusing to provide a DNA sample, the State argues he was given fair notice of the consequences before he refused.

For the reasons that follow, we agree with Shepard and the district court that the retroactive expansion of the scope of good time forfeiture violated the prohibitions against ex post facto laws, found in the Ex Post Facto Clauses of U.S. Const. art. I, § 10, and Neb. Const. art. I, § 16. While the requirement of DNA sampling, in itself, may be civil, the attendant forfeiture of good time increases the quantum of punishment for Shepard's original crimes beyond the measure of punishment legally stated at the time they were committed.

(a) Ex Post Facto Prohibitions

[7] The ex post facto prohibitions found in the Ex Post Facto Clauses of U.S. Const. art. I, § 10, and Neb. Const. art. I, § 16, forbid Congress and the states to enact any law "'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'"[17] Stated another way, the Ex Post Facto Clauses "'forbid[] the application of any new punitive measure to a crime already consummated.'"[18]

[8] The Ex Post Facto Clauses ensure that individuals have fair warning of applicable laws, and they guard against vindictive legislative action.[19] Even where these concerns are not directly implicated, the clauses also safeguard "'a fundamental fairness interest . . . in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.'"[20]

---

[17] *Weaver v. Graham*, 450 U.S. 24, 28, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981).

[18] *California Dept. of Corrections v. Morales*, 514 U.S. 499, 505, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995).

[19] See *Peugh v. U.S.*, ___ U.S. ___, 133 S. Ct. 2072, 186 L. Ed. 2d 84 (2013).

[20] *Id.*, 133 S. Ct. at 2085.

[9] To fall within the ex post facto prohibition, a law must be retrospective or retroactive[21]—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it either by altering the definition of criminal conduct or by increasing the punishment for the crime.[22]

[10,11] Only retroactive criminal punishment for past acts is prohibited.[23] The retroactive application of civil disabilities and sanctions is permitted.[24] But any statute that punishes as a crime an act previously committed which was innocent when done, which makes more burdensome the punishment for a crime after its commission, or which deprives one charged with a crime of any defense available according to law at the time when the act was committed is prohibited as ex post facto.[25] Subtle ex post facto violations are no more permissible than overt ones.[26]

### (b) Retrospective Increases in Quantum of Punishment Through Changes in Good Time Scheme Violate Ex Post Facto Principles

In *Weaver v. Graham*,[27] the U.S. Supreme Court held that it is a violation of the prohibition against ex post facto laws to apply a new formula for calculating future good time credits to a person incarcerated for a crime committed before the new law was passed. The new law reduced the amount of good time automatically available through performance of satisfactory work and avoidance of disciplinary violations, but

---

[21] See 16A C.J.S. *Constitutional Law* § 559 (2005).

[22] See *Lynce v. Mathis*, 519 U.S. 433, 117 S. Ct. 891, 137 L. Ed. 2d 63 (1997).

[23] *State v. Worm*, 268 Neb. 74, 680 N.W.2d 151 (2004).

[24] *Id*.

[25] *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012). See, also, *Carmell v. Texas*, 529 U.S. 513, 120 S. Ct. 1620, 146 L. Ed. 2d 577 (2000); *Collins v. Youngblood*, 497 U.S. 37, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990).

[26] *Collins v. Youngblood, supra* note 25.

[27] *Weaver v. Graham, supra* note 17.

increased the amount of discretionary good time available for specific productive conduct.[28] The Court reasoned that regardless of whether the good time was a vested right, there was a lack of fair notice and governmental restraint because the legislature increased the inmate's punishment beyond what was prescribed when the crime was consummated.[29] "[E]ven if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense."[30]

The Court in *Weaver v. Graham* rejected the state's argument that the law altering the availability of good time was prospective, and not retrospective, because it operated only upon the accumulation of good time after its effective date. The Court explained:

> This argument fails to acknowledge that it is the effect, not the form, of the law that determines whether it is *ex post facto*. The critical question is whether the law changes the legal consequences of acts completed before its effective date. In the context of this case, this question can be recast as asking whether [the statute] applies to prisoners convicted for acts committed before the provision's effective date. Clearly, the answer is in the affirmative.[31]

The Court in *Weaver v. Graham* also rejected the state's argument that the new good time statute was not retrospective, because good time is not part of the punishment annexed to the crime. The Court explained:

> First, we need not determine whether the prospect of the gain time was in some technical sense part of the sentence to conclude that it in fact is one determinant of petitioner's prison term—and that his effective sentence is altered once this determinant is changed. . . . Second,

---

[28] *Id*. See, also, *Lynce v. Mathis, supra* note 22.

[29] *Weaver v. Graham, supra* note 17.

[30] *Id*., 450 U.S. at 30-31.

[31] *Id*., 450 U.S. at 31.

we have held that a statute may be retrospective even if it alters punitive conditions outside the sentence.[32] The Court concluded that the new good time statute "substantially alters the consequences attached to a crime already completed, and therefore changes 'the quantum of punishment.'"[33]

Finally, the Court rejected the state's argument that the net effect of all the new good time provisions was to increase availability of good time deduction and, thus, that the change was not to the defendant's disadvantage. The Court held that the alteration in the quantum of punishment was to the inmate's disadvantage because there was a reduced opportunity to shorten time in prison "simply through good conduct."[34] The Court explained:

> The fact remains that an inmate who performs satisfactory work and avoids disciplinary violations could obtain more gain time per month under the repealed provision . . . than he could for the same conduct under the new provision . . . . To make up the difference, the inmate has to satisfy the extra conditions specified by the discretionary gain-time provisions. Even then, the award of the extra gain time is purely discretionary, contingent on both the wishes of the correctional authorities and special behavior by the inmate, such as saving a life or diligent performance in an academic program. . . . In contrast, under both the new and old statutes, an inmate is automatically entitled to the monthly gain time simply for avoiding disciplinary infractions and performing his assigned tasks.[35]

Because the new good time scheme made more onerous the punishment for the crimes committed before its enactment, the Court in *Weaver v. Graham* held that it violated the prohibition against ex post facto laws.[36]

---

[32] *Id.*, 450 U.S. at 32.

[33] *Id.*, 450 U.S. at 33.

[34] *Id.*, 450 U.S. at 34.

[35] *Id.*, 450 U.S. at 35.

[36] *Weaver v. Graham, supra* note 17.

### (c) Retroactive Application of Changes to Discretionary Elements of Parole Only Ex Post Facto if Significant Risk of Lengthening Time Incarcerated

Such alteration of the substantive formula for good time is treated distinctly from the retrospective application of changes to discretionary elements of the parole process. The U.S. Supreme Court has observed that "[w]hether retroactive application of a particular change in parole law respects the prohibition on *ex post facto* legislation is often a question of particular difficulty when the discretion vested in a parole board is taken into account."[37] The question in such cases is a "matter of degree" and depends on whether the retroactive application of the change creates "'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'"[38]

In two cases, the U.S. Supreme Court held that retroactive changes that decreased the frequency of parole hearings did not create a sufficient risk of increasing the likelihood of longer incarceration that would violate the ex post facto prohibition.[39] In *Garner v. Jones*[40] and *California Dept. of Corrections v. Morales*,[41] the Court reasoned that the changes to the parole laws in question (1) did not change the substantive formula for securing any reductions to sentence ranges, (2) did not affect the standards for determining a prisoner's suitability for parole and setting a release date, and (3) did not

---

[37] *Garner v. Jones*, 529 U.S. 244, 250, 120 S. Ct. 1362, 146 L. Ed. 2d 236 (2000).

[38] *Id*.

[39] See, *Garner v. Jones, supra* note 37; *California Dept. of Corrections v. Morales, supra* note 18. See, also, *Moore v. Nebraska Bd. of Parole*, 12 Neb. App. 525, 679 N.W.2d 427 (2004).

[40] *Garner v. Jones, supra* note 37.

[41] *California Dept. of Corrections v. Morales, supra* note 18.

present any "significant risk"[42] of lengthening the time spent in prison.[43]

The Court explained that "the *Ex Post Facto* Clause should not be employed for 'the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures.' . . . The States must have due flexibility in formulating parole procedures and addressing problems associated with confinement and release."[44] And, while

> [t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause, . . . to the extent there inheres in *ex post facto* doctrine some idea of actual or constructive notice[,] . . . where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised.[45]

The concurring opinion in *Garner v. Jones* advocated for a distinction between the penalties that a person can anticipate for the commission of a particular crime and the opportunities for mercy or clemency that may go to the reduction of the penalty. The concurrence admitted, "At the margins, to be sure, it may be difficult to distinguish between justice and mercy."[46] It illustrated then: "A statutory parole system that reduces a prisoner's sentence by fixed amounts of time for good behavior during incarceration can realistically be viewed as an entitlement—a reduction of the prescribed penalty—rather than a discretionary grant of leniency. But that is immeasurably far removed from the present case."[47]

---

[42] *Garner v. Jones, supra* note 37, 529 U.S. at 255.

[43] See, *id.*; *California Dept. of Corrections v. Morales, supra* note 18.

[44] *Garner v. Jones, supra* note 37, 529 U.S. at 252.

[45] *Id.*, 529 U.S. at 253.

[46] *Id.*, 529 U.S. at 258 (Scalia, J., concurring in part in judgment).

[47] *Id.*

(d) Requiring DNA Sample
Is Not Punitive

The State is correct that, standing alone, requiring DNA sampling is not punishment at all. Courts have consistently held that requiring a convicted person to submit a DNA sample does not violate the prohibition against ex post facto laws, because such a requirement is not punitive.[48]

[12] Further, courts consistently hold that when a law requiring a DNA sample punishes refusal to provide a sample as an offense *separate* from the offense that made the person subject to DNA sampling, such law does not violate ex post facto prohibitions.[49] Rather, the punishment is solely for the new offense of refusing to provide the DNA sample—even though the original offense may have been the "but for" reason for the DNA sample requirement. Such punishment is not a new punitive measure of the original offense.

This is similar to our Sex Offender Registration Act (SORA). The requirement of registration, in itself, is not punitive.[50] Further, we have held that although Neb. Rev. Stat. § 29-4011 (Cum. Supp. 2012) imposes a criminal penalty for those found guilty of failing to register under SORA, such punishment is not for behavior that occurred before the statute's enactment.[51]

---

[48] See, e.g., *U.S. v. Coccia*, 598 F.3d 293 (6th Cir. 2010); *Johnson v. Quander*, 440 F.3d 489 (D.C. Cir. 2006); *Shaffer v. Saffle*, 148 F.3d 1180 (10th Cir. 1998); *People v. Espana*, 137 Cal. App. 4th 549, 40 Cal. Rptr. 3d 258 (2006); *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004); *State v. Norman*, 660 N.W.2d 549 (N.D. 2003); *Doe v. Gainer*, 162 Ill. 2d 15, 642 N.E.2d 114, 204 Ill. Dec. 652 (1994).

[49] See, e.g., *U.S. v. Hook*, 471 F.3d 766 (7th Cir. 2006); *Word v. U.S. Probation Dept.*, 439 F. Supp. 2d 497 (D.S.C. 2006); *Vore v. U.S. Dept. of Justice*, 281 F. Supp. 2d 1129 (D. Ariz. 2003); *In re D.L.C.*, 124 S.W.3d 354 (Tex. App. 2003).

[50] *In re Interest of J.R.*, 277 Neb. 362, 762 N.W.2d 305 (2009); *Welvaert v. Nebraska State Patrol*, 268 Neb. 400, 683 N.W.2d 357 (2004); *Slansky v. Nebraska State Patrol*, 268 Neb. 360, 685 N.W.2d 335 (2004); *State v. Worm, supra* note 23. See, also, *Smith v. Doe*, 538 U.S. 84, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003).

[51] See *State v. Harris*, 284 Neb. 214, 817 N.W.2d 258 (2012).

It is "not additional punishment for the crimes that resulted in a person's being subject to SORA; instead, it punishes the act of failing to comply with SORA once a person is subject to its requirements."[52]

At issue here, however, is not punishment of refusal to submit a DNA sample as a separate offense. At issue here is the mandatory forfeiture of all good time, and this forfeiture results in an increased period of incarceration for the original offense, which was committed before the statute's enactment.

### (e) Changes to Consequences of Original Crime as Result of Failure to Abide by New Rules

Section 29-4106(2) arguably falls under a class of "close cases" wherein courts have traditionally had more difficulty determining if the consequence for failure to adhere to new prescriptions should be considered the continuing legal consequence of the original crimes or the independent legal consequence of later misconduct.[53]

The Sixth Circuit, in *U.S. v. Reese*,[54] opined that if the new punishment applies to everyone who has committed the predicate offense without regard to any subsequent offense, there is clearly an ex post facto violation. In contrast, an increased punishment *of the new crime*, but based on recidivism, has uniformly been upheld as constitutional.[55] In such cases, the punishment is not "'for the earlier offense,'" even though the punishment was a "but for" consequence of that earlier offense.[56]

Changes to the consequences attendant to the original crime, but based on new conduct subsequent to those changes,

---

[52] *Id*. at 224, 817 N.W.2d at 269.

[53] *U.S. v. Reese*, 71 F.3d 582, 588 (6th Cir. 1995).

[54] *Id*.

[55] See, e.g., *Taylor v. State*, 114 Neb. 257, 207 N.W. 207 (1926); *Smith v. State*, 199 P.3d 1052 (Wyo. 2009); *State v. Everett*, 816 So. 2d 1272 (La. 2002); *State v. Jones*, 344 S.C. 48, 543 S.E.2d 541 (2001).

[56] *U.S. v. Reese, supra* note 53, 71 F.3d at 589.

however, create more confusion. The Sixth Circuit framed the relevant ex post facto question for these situations as: "Is there fair notice, and is the punishment for the *original* conduct being imposed or increased?"[57]

In the context of changes to release eligibility based on the failure to provide a DNA sample, courts illustrate that the ex post facto question is more specifically whether the subsequently established requirement lengthens the time incarcerated under the original sentence and, if so, whether the inmate was on fair notice at the time the crime was committed that the requirement in question could change. Where the length of incarceration is increased by virtue of the new law, the distinction of whether the new law is ex post facto hinges on whether the change involved matters of discretion—or other changes clearly contemplated by the original statutory scheme—or whether instead the change involved the standards for determining a prisoner's suitability for parole or for setting a release date.

### (i) Jones v. Murray—*Forfeiture of Mandatory Good Time for Refusing DNA Sample Violated Ex Post Facto Principles*

Thus, in *Jones v. Murray*,[58] the Fourth Circuit held that a statute that required a DNA sample from convicted felons and sex offenders violated the prohibition against ex post facto laws to the extent it could be enforced to modify mandatory parole.

The statutory scheme in force when the inmate in question committed his crimes provided that every person "'shall be released on parole . . . six months prior to his date of final discharge.'"[59] The only exception at the time of the inmate's crimes was if new information was provided to the parole board giving the board reasonable cause to believe that release

---

[57] *Id.* at 590 (emphasis in original).

[58] *Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992).

[59] *Id.* at 309 (emphasis omitted).

posed a clear and present danger to the life or physical safety of any person.[60]

Subsequent to the inmate's crimes, a DNA blood testing requirement was passed, stating:

> "Notwithstanding the provisions [providing for release 6 months before the date of final discharge with such limited exception in the case of being a clear and present danger], any person convicted of a felony who is in custody after July 1, 1990, shall provide a blood sample prior to his release."[61]

The court in *Jones v. Murray* noted that the DNA testing itself was not punitive. Further, the court observed in dicta that it would not be contrary to the prohibitions against ex post facto laws for violators to be administratively punished "within the terms of the prisoners' original sentence" for the failure to provide samples.[62] This was because "reasonable prison regulations, and subsequent punishment for infractions thereof, are contemplated as part of the sentence of every prisoner."[63] "[S]ince a prisoner's original sentence does not embrace a right to one set of regulations over another, reasonable amendments, too, fall within the anticipated sentence of every inmate."[64] Accordingly, the statute did not violate the prohibition against ex post facto in "its possible effect in authorizing prison punishment, the denial of good-time credits, or consideration by the parole board in granting discretionary parole to compel the inmate to provide a sample, because it does not thereby alter any prisoner's sentence for past conduct."[65]

However, the court held that punishing the refusal to provide a DNA sample through the denial of the statutory

---

[60] *Id.*

[61] *Id.* at 308 (emphasis omitted).

[62] *Id.* at 310.

[63] *Id.* at 309.

[64] *Id.* at 309-10.

[65] *Id.* at 310.

6-month mandatory parole inherent to the original sentence constituted after-the-fact punishment of the original crimes. The court elaborated that the prisoner was being denied the benefit present at the time of his original crimes of being entitled to a 6-month reduction in sentence unless he constituted a clear and present danger to society. There was no indication that refusing to provide a DNA sample made the inmate a clear and present danger to society.

The court severed that part of the DNA statute which referred to modifying mandatory parole upon an inmate's refusal to provide a DNA sample.

### *(ii)* State v. Henry County Dist. Ct.—*Changes to Laws Specifying New Conduct That Would Earn or Forfeit Good Time Violated Ex Post Facto Principles*

Though not a DNA case, in *State v. Henry County Dist. Ct.*,[66] the court similarly held that a statute that added requirements to the previously automatic accrual of good time for simple good conduct violated the prohibition against ex post facto laws. The statutory scheme in place at the time the inmate committed his crimes allowed an inmate to earn a specified amount of good time for simple good conduct and another specified amount of good time for participation in listed activities. Subsequently, the statute was amended such that an inmate who was required to participate in a sex offender treatment program was ineligible for any good time reduction of his or her sentence unless the inmate participated in and completed the sex offender treatment program. An implementing regulation stated that inmates required to participate in sex offender treatment programs who refused treatment, were removed from treatment, or failed program completion criteria would not be eligible for earned time credits. The inmate in question had been temporarily removed from a sex offender treatment program for misconduct. During his removal, the inmate did not earn any good time, thus ultimately extending his tentative date for discharge by 4 months.

---

[66] *State v. Henry County Dist. Ct.*, 759 N.W.2d 793 (Iowa 2009).

The court in *State v. Henry County Dist. Ct.* reasoned that to the extent the inmate could no longer automatically earn good time merely by following institutional rules, without participating in programs required by the director, the amended statute and its implementing regulation made the penalty for the inmate's original crime more onerous. "[I]f [the inmate] does not participate in the [sex offender treatment program,] he will have a longer period of incarceration under the amended statute than he would have had under the statute in effect at the time of his sentencing."[67] In fact, the inmate's "failure to satisfactorily participate renders him ineligible to earn *any* reduction in his sentence, even if he has no disciplinary infractions."[68]

The court rejected the argument that the inmate was given fair notice because his failure to participate in the sex offender treatment occurred after the passage of the amended statute and the pertinent regulation. The court found that the state's analysis was "misplaced."[69] The question, the court reasoned, was whether the inmate was on notice when he committed his original crime and was sentenced that he would not be eligible for a reduction in his sentence by merely following prison rules.[70]

The court also rejected the State's argument that the amended statute and the implementing regulation merely changed the institutional rules contemplated as part of the sentence of every prisoner. Although an inmate would have been on notice that the precise conduct required to qualify for good time credit could vary over time, an inmate "would have had the expectation that, if he simply complied with institutional rules, he could cut his sentence in half."[71] Furthermore, given the wording of the statutes at the time of the inmate's crimes, he would have understood that compliance with

---

[67] *Id.* at 800.

[68] *Id.* at 801 (emphasis in original).

[69] *Id.* at 799.

[70] *State v. Henry County Dist. Ct., supra* note 66.

[71] *Id.* at 802.

institutional rules and participation in treatment programs were treated distinctly.

### (iii) Courts Distinguish Jones v. Murray and Find No Ex Post Facto Violation When New Law or Regulation Does Not Lengthen Time in Prison

In contrast to the facts presented in *Jones v. Murray* or *State v. Henry County Dist. Ct.*, internal prison sanctions for failure to submit a DNA sample that do not affect the prisoner's parole eligibility date or discharge date have uniformly been held not to violate the prohibition against ex post facto laws.[72] Such changes to internal punishments are contemplated as part of the sentence of every prisoner.

Thus, in *Padgett v. Ferrero*,[73] the court held that disciplinary action, followed by taking a sample by force in the event of continued refusal, was not an ex post facto law, because "no prison sentences will be extended because of the failure to cooperate with the statute."[74] Likewise, the court in *Cooper v. Gammon*[75] held that it did not violate ex post facto prohibitions for the prison to impose solitary confinement for an inmate who refused to submit a DNA sample under laws enacted since he committed his crimes.

### (iv) Courts Distinguish Jones v. Murray and Find No Ex Post Facto Violation When Inmate Was on Notice at Time of Crimes That the Act Was Available and Subject to Changing Regulations or Discretion

Furthermore, courts have held that there is no violation of the prohibition against ex post facto laws in the denial or

---

[72] See, *Dominique v. Weld*, 73 F.3d 1156 (1st Cir. 1996); *Padgett v. Ferrero*, 294 F. Supp. 2d 1338 (N.D. Ga. 2003); *Schreiber v. State*, 666 N.W.2d 127 (Iowa 2003); *Cooper v. Gammon*, 943 S.W.2d 699 (Mo. App. 1997).

[73] *Padgett v. Ferrero, supra* note 72.

[74] *Id.* at 1344-45.

[75] *Cooper v. Gammon, supra* note 72. See, also, *Dominique v. Weld, supra* note 72.

revocation of parole or good time for refusing to submit a
DNA sample when the original statutory scheme made clear
that actual release, continued release, or the earning of good
time credits was subject to the discretion of prison officials or
to changing laws or regulations.[76]

Thus, where the convicted person was previously subject
to the generally stated requirement that while on supervised
release or parole, he or she follow parole agent directives and
not commit other crimes, then new laws criminalizing refusal
to submit a DNA sample and allowing for revocation of parole
or supervised release based on such refusal did not violate
the prohibition against ex post facto laws.[77] Such potential
revocation of supervised release or parole did not increase
the plaintiff's punishment for a prior conviction because, as
a part of the original sentence, the plaintiff was subject to
the mandatory conditions that he or she not commit another
crime (refusal to submit a DNA sample being a separate mis-
demeanor) and that he or she follow the instructions of the
probation officer.[78] "[I]t is well settled that the conditions of
parole can be changed at any time."[79]

Similarly, courts hold that there is no violation of the pro-
hibition against ex post facto laws when refusal to submit a
DNA sample is the basis for the discretionary determination
to deny release on parole.[80] For example, in *Dial v. Vaughn*,[81]
the DNA testing statute provided that an inmate shall not be

---

[76] *U.S. v. Hook, supra* note 49; *Johnson v. Quander, supra* note 48; *Word
v. U.S. Probation Dept., supra* note 49; *Miller v. U.S. Parole Comm'n*,
259 F. Supp. 2d 1166 (D. Kan. 2003); *Cannon v. South Carolina Dept.
of Probation*, 361 S.C. 425, 604 S.E.2d 709 (2006), *reversed on other
grounds* 371 S.C. 581, 641 S.E.2d 429 (2007).

[77] See cases cited *supra* note 76.

[78] *Word v. U.S. Probation Dept., supra* note 49; *Miller v. U.S. Parole
Comm'n, supra* note 76.

[79] *Miller v. U.S. Parole Comm'n, supra* note 76, 259 F. Supp. 2d at 1170.

[80] See, *Boling v. Romer*, 101 F.3d 1336 (10th Cir. 1997); *Dial v. Vaughn*, 733
A.2d 1 (Pa. Commw. 1999). See, also, *Com. v. Derk*, 895 A.2d 622 (Pa.
Super. 2006).

[81] *Dial v. Vaughn, supra* note 80. See, also, *Com. v. Derk, supra* note 80.

released before expiration of the maximum term of confinement unless and until the inmate provided a DNA sample. The court interpreted this statute, however, as not changing either the mandatory release date or the parole eligibility date. Instead, the court focused on the distinction between parole eligibility and parole release, and found that the statute governed only parole release. Then, the court explained that the inmate was on notice from the time of his crimes that actual release on parole depended upon full compliance with a variety of prison rules and administrative requirements. Therefore, the court concluded that the changes to the specifics of those rules and regulations did not increase the measure of punishment attached to the original sentence.

In *Ewell v. Murray*,[82] the court held that where the original law set forth broad categories of good time eligibility, and where the inmate was on notice that the details of those categories were subject to changing rules and regulations, retrospective changes to the criteria for the categories of good time eligibility did not violate the prohibition against ex post facto laws.

At the time of the inmate's crimes, the law considered in *Ewell v. Murray* stated that inmates shall be given the opportunity to earn good time, based on a four-level classification system. But the law explicitly stated that persons could be reclassified according to prison rules and regulations. One of those classifications meant that no good time could be earned. Subsequently, an amended regulation provided for reclassification to a good-time-ineligible category for refusing to provide a DNA sample. Another amended regulation provided for forfeiture of previously earned good time.

Considering some of the same laws at issue in *Jones v. Murray*, the court in *Ewell v. Murray* explained that the good time credits under the four categories were cumulative to the mandatory 6-month release period discussed in *Jones v.*

---

[82] *Ewell v. Murray*, 813 F. Supp. 1180 (W.D. Va. 1993). See, also, *Smith v. Beck*, 176 N.C. App. 757, 627 S.E.2d 284 (2006).

*Murray*. These laws were distinguishable from changes affecting the mandatory 6-month release date because, under the laws controlling at the time of the inmate's crimes, an inmate had no right to be released on either discretionary or mandatory parole before that 6-month release date.

### (v) U.S. Supreme Court Has Indicated That Whether Change to Original Punishment Based on New Conduct Implicates Ex Post Facto Must Be Determined From Notice at Time of Original Crimes, Not at Time of New Conduct

Cases finding no ex post facto violation upon such consequences for failing to provide a DNA sample sometimes play lipservice to the notion that the punishment was for the refusal to provide a sample, which occurred after the amended law or regulation, and was not an increase in the quantum of punishment for the original crime occurring before the amended law or regulation. But we can find no case wherein a court has concluded that the new law was constitutionally applied to the convicted person when the consequences were an increase in the time incarcerated and the convicted person would not have contemplated the underlying change in the law or regulation at the time of the crime leading to that incarceration.

Most important, the U.S. Supreme Court has repeatedly rejected the notion that a law affecting the period of incarceration for the original crime, but only if the inmate commits or fails to commit certain actions after passage of the new law, somehow does not relate to the original crime for purposes of an ex post facto analysis.

As already discussed, in *Weaver v. Graham*, the U.S. Supreme Court rejected the idea that changes to the good time system, because they applied only to the accumulation of good time after passage of the changes, were prospective and not retrospective.[83] The Court explained that the point of time to

---

[83] *Weaver v. Graham, supra* note 17.

be focused on was when the crimes were committed that led to the incarceration that is being affected by the good time.[84]

In *Scafati v. Greenfield*,[85] the U.S. Supreme Court summarily affirmed a decision by the lower court that a law passed after the inmate's crimes but before his release on parole, making a prisoner good time ineligible for 6 months if the prisoner committed a violation of parole, was ex post facto. In *Greenfield v. Scafati*,[86] the lower court explained that while under the law at the time of the prisoner's crime, the inmate could become good time ineligible through misbehavior *during confinement*, there was no prior provision for forfeiture of future good time eligibility through misbehavior while *on parole*. The court found that insofar as the new law thus increased the scope of opportunities to forfeit good time eligibility, it was ex post facto. The court observed that the availability of good conduct deductions was considered part of the sentence for the original crime. Likewise, although a prisoner's entitlement to parole lies in the discretion of the parole board, it does "not follow because a prisoner might not receive parole that it would not be an unlawful ex post facto burden to deprive him altogether of the right to be found qualified," and "hence earn, parole."[87]

Subsequently, in *Johnson v. United States*,[88] the U.S. Supreme Court reaffirmed, in dicta, its decision in *Scafati v. Greenfield*. In *Johnson v. United States*, the Court determined that because the district court always had the same powers under preexisting law, there was no ex post facto question concerning a statute that allowed for revocation of the supervised release of the original offense, including no credit for time served under such supervised release, upon violation of the conditions of release. Nevertheless, the Court went out of its

---

[84] *Id.*

[85] *Scafati v. Greenfield*, 390 U.S. 713, 88 S. Ct. 1409, 20 L. Ed. 2d 250 (1968).

[86] *Greenfield v. Scafati*, 277 F. Supp. 644 (D.C. Mass. 1967).

[87] *Id.* at 646.

[88] *Johnson v. United States*, 529 U.S. 694, 120 S. Ct. 1795, 146 L. Ed. 2d 727 (2000).

way to reject the reasoning of the lower court that there was no ex post facto violation, because the law imposed a punishment for the new offense of violating the supervised release conditions and did not increase the quantum of punishment for the original offense.

The Court said that "[w]hile this understanding of revocation of supervised release has some intuitive appeal, [such understanding raises] serious constitutional questions . . . ."[89] First, "the violative conduct need not be criminal and need only be found by a judge under a preponderance of the evidence standard, not by a jury beyond a reasonable doubt."[90] Second, "[w]here the acts of violation are criminal in their own right, they may be the basis for separate prosecution, which would raise an issue of double jeopardy if the revocation of supervised release were also punishment for the same offense."[91] The Court concluded that "[t]reating postrevocation sanction as part of the penalty for the initial offense . . . avoids these difficulties."[92] The Court further observed that treating such sanctions as part of the penalty for the initial offense is "all but entailed by our summary affirmance of *Greenfield v. Scafati*."[93]

"We therefore attribute postrevocation penalties to the original conviction,"[94] said the Court. The Court explained:

> Since postrevocation penalties relate to the original offense, to sentence [the defendant] to a further term of supervised release [under the law enacted after the original crimes but before the conduct on supervised release] would be to apply this [law] retroactively (and to raise the remaining *ex post facto* question, whether that application makes him worse off).[95]

---

[89] *Id*., 529 U.S. at 700.

[90] *Id*.

[91] *Id*.

[92] *Id*.

[93] *Id*., 529 U.S. at 701.

[94] *Id*.

[95] *Id*.

*(vi) § 29-4106(2) and A.R. 116.04 Are Ex Post
Facto to Extent They Provide for Forfeiture
of Good Time for Refusing to
Submit DNA Sample*

Cases such as *Weaver v. Graham*, *Scafati v. Greenfield*, and *Johnson v. United States* make clear that we cannot accept the State's argument that the penalties for Shepard's refusal to provide a DNA sample relate to the prospective act of refusal and not to the original crimes for which Shepard was incarcerated. The analysis is as simple as observing that § 29-4106(2) affects changes to Shepard's period of incarceration for the original crimes committed before its enactment. Section 29-4106(2) does not set forth a separate crime with a separate punishment. We are not presented with the question of punishment for the refusal to submit a DNA sample as a separate crime. Section 29-4106(2) as applied to Shepard was retrospective because it changed the period of incarceration for a crime committed before its enactment.

We further conclude that Shepard did not have fair notice of the changes to the good time scheme mandated by § 29-4106(2). Section 29-4106(2) did not make changes in the kind of discretionary disciplinary measures discussed in cases such as *California Dept. of Corrections v. Morales* or *Ewell v. Murray*. Nor did § 29-4106(2) merely change or elaborate upon the category of disciplinary measures considered to be gross or serious misconduct.

At the time of Shepard's crimes, he expected that his mandatory discharge date would be calculated based on a mandatory scheme of good time accumulation. He further expected that the only possible forfeiture of this good time would be in finite amounts upon the discretion of the prison officials, and only upon gross or serious misconduct. Looking at the well-defined parameters of the mandatory good time scheme in effect at the time of Shepard's crimes with a limited scope of forfeiture, we find he did not have fair notice that the scheme would change to mandating automatic forfeiture of all past and future good time upon refusal to submit a DNA sample, thereby entailing a much larger amount of forfeiture than previously possible, for an act that was not gross or serious

misconduct, and outside the traditional discretionary, disciplinary process.

[13] Finally, we conclude that § 29-4106(2), in mandating forfeiture of all good time and thereby increasing the period of Shepard's incarceration, is punitive. While the requirement of providing a DNA sample is not itself punitive, the provision of § 29-4106(2) that increases the period of incarceration by mandating recalculation of the release date to the maximum term of confinement clearly is. This is not meaningfully different from cases such as *California Dept. of Corrections v. Morales*,[96] *State v. Henry County Dist. Ct.*,[97] *Jones v. Murray*,[98] *Scafati v. Greenfield*,[99] and *Johnson v. United States*.[100] Those cases illustrate that it does not matter if the new requirement is especially onerous or could be, in itself, considered "civil." The new requirement considered in *State v. Henry County Dist. Ct.*, that the inmate participate in sex offender treatment, although not in itself onerous or even punitive, was held to be an ex post facto law when the consequence for the failure to participate in the treatment was removal from good time eligibility. The new requirement considered in *Weaver v. Graham*, that the inmate demonstrate meritorious behavior, might in itself be considered civil, but the court held that when such meritorious behavior was not a requirement for good time eligibility before, the law adding that requirement was ex post facto.

Failure to satisfy the new requirement of providing a DNA sample results in an increased period of incarceration. And an increased period of incarceration is punitive. Due to the expanded scope of good time forfeiture and the imminent removal of his good time, Shepard is "worse off" than he was before the passage of § 29-4106(2).[101]

---

[96] *California Dept. of Corrections v. Morales, supra* note 18.

[97] *State v. Henry County Dist. Ct., supra* note 66.

[98] *Jones v. Murray, supra* note 58.

[99] *Scafati v. Greenfield, supra* note 85.

[100] *Johnson v. United States, supra* note 88.

[101] See *id.*

In conclusion, we agree with the district court that insomuch as § 29-4106(2) forfeits Shepard's past and future good time and recalculates his parole eligibility and mandatory discharge dates without regard to any good time, it violates the constitutional prohibitions against ex post facto laws. Shepard, at the time of his crimes, expected to automatically incur good time simply through good conduct, and he expected to have his mandatory discharge date calculated upon his maximum sentence minus good time. Section 29-4106(2), by allowing for forfeiture of more good time than could have been forfeited before and by allowing for forfeiture based on conduct that is something less than flagrant and serious misconduct—indeed, conduct not even contemplated at the time of Shepard's crimes—substantially altered the punitive consequences attached to his crimes.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Affirmed.

———————————

In re Interest of Nathaniel M., a child
under 18 years of age.
Nebraska Department of Health and Human Services,
appellant, v. State of Nebraska and
Nathaniel M., appellees.
___ N.W.2d ___

Filed November 7, 2014.    Nos. S-13-1066 through S-13-1068.

1.  **Moot Question: Jurisdiction: Appeal and Error.** Because mootness is a justiciability doctrine that operates to prevent courts from exercising jurisdiction, an appellate court reviews mootness determinations under the same standard of review as other jurisdictional questions.
2.  ____: ____: ____. When a jurisdictional question does not involve a factual dispute, its determination is a matter of law, which requires an appellate court to reach a conclusion independent of the decisions made by the lower courts.
3.  **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.